Filed 3/15/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| ECC CAPITAL CORPORATION et al., | B265760 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC429484) |
| v. | |
| MANATT, PHELPS & PHILLIPS, LLP, | |
| Defendant and Respondent. | |


APPEAL from judgment of the Superior Court of
Los Angeles County, Mark Mooney, Judge.  Affirmed.

Law Office of Julie M. McCoy, Julie M. McCoy; Sall
Spencer Callas & Krueger, Robert K. Sall, Lara A.S. Callas;
Lane Powell and Paul George for Plaintiffs and Appellants.

Kendall Brill & Kelly, Alan Jay Weil, Corey E. Klein and
Richard M. Simon for Defendant and Respondent.

————————————

# INTRODUCTION

ECC Capital Corporation and its subsidiary, Performance Credit, LLC, formerly known as Encore Credit Corp., (collectively, ECC) appeal from a judgment confirming a final arbitration award of almost $7 million against them and in favor of Manatt, Phelps & Phillips, LLP (Manatt). The award was for attorneys' fees, expert fees, and costs incurred by Manatt as the prevailing party in an arbitration of legal malpractice claims ECC brought against Manatt.

ECC contends the trial court erred in confirming the arbitrator's interim award denying ECC's claims because the arbitrator violated mandatory disclosure rules governing arbitrations. ECC also contends the trial court erred in confirming the final award because Manatt's engagement agreement was illegal, Manatt obtained the award by fraud, and the arbitrator limited ECC's rights to take discovery and present evidence at the arbitration on the issue of Manatt's conflict of interest. Because we conclude ECC's arguments are either meritless or forfeited, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A. *ECC Contracts with and Then Sues Bear Stearns*

In October 2006 ECC Capital and Bear Stearns Residential Mortgage Corporation (Bear Stearns)[1] entered into an Asset

---

[1] Two other entities affiliated with Bear Stearns Residential Mortgage Corporation played a role in this transaction: Bear Stearns Mortgage Capital Corporation and EMC Mortgage Corporation. Except where we need to distinguish among them,

2

Purchase Agreement (APA) providing that Bear Stearns would buy ECC Capital's subprime mortgage loan origination business, Encore Credit Corp (Encore). The APA required Encore to originate a minimum average of $400 million in mortgage loans per month for as many months as it took the parties to close the transaction, a period they expected to last approximately three months. The APA required Bear Stearns to purchase and securitize the loans Encore originated during this "pre-closing period."

ECC Capital hired Latham & Watkins (Latham) as "deal counsel" for this transaction. ECC Capital also hired Manatt partner Ellen Marshall to help negotiate and draft Section 7 of the APA, the portion of the agreement governing Bear Stearns' obligation to purchase and securitize the loans Encore originated during the pre-closing period. According to ECC Capital, Bear Stearns had agreed, and ECC Capital understood and intended, that Bear Stearns would purchase those loans before the borrowers' first payments were due, so that Bear Stearns would assume all risk of early defaults. ECC Capital claimed it communicated its intention on this point to Marshall and, based

---

we will refer to these three entities, collectively and interchangeably, as "Bear Stearns." We will refer separately to another affiliated entity, Bear Stearns & Co., Inc., which is one of the many subsidiaries of The Bear Stearns Companies, Inc. We note that throughout these proceedings, and as quoted in this opinion, the parties and other participants have often referred to "Bear Stearns" or simply "Bear" without specifying the entity intended.

on conversations with her, understood the final draft of Section 7 reflected that intention.[2]

By December 2006, however, a dispute had arisen between ECC Capital and Bear Stearns about the timing of Bear Stearns' obligation to purchase the loans Encore originated. Roque Santi, President of ECC Capital and Encore, felt Bear Stearns was "not living up to the spirit of the deal" because Bear Stearns was not purchasing all of the loans "promptly upon origination." Bear Stearns' position was that the APA did not obligate it to purchase the loans before the first payments were due, but did prohibit it, after purchasing a loan, from requiring Encore to repurchase the loan in the event of an early payment default (or breach of a representation or warranty), as Bear Stearns had required when previously purchasing loans from Encore.

---

[2] Section 7 provided, in relevant part: "The parties further agree that an Affiliate of [Bear Stearns] shall be the sole lead underwriter for all securitizations relating to the Mortgage Loans . . . and in connection therewith, all parties acknowledge that such securitizations shall occur on a monthly basis. . . . In connection with a [delay in securitization by ECC Capital, ECC Capital] shall bear all economic risk relating to the Mortgage Loans or otherwise related to the proposed securitization, including, but not limited to, defaults, prepayments and breaches of representations and warranties relating thereto." This quotation comes from the arbitrator's interim award ruling, and the bracketed term "[Bear Stearns]" is the arbitrator's, who in the ruling used "Bear Stearns" to refer, collectively, to Bear Stearns & Co., Inc. and Bear Stearns Residential Mortgage Corporation.

4

ECC Capital and Bear Stearns ultimately closed the transaction contemplated by the APA on February 9, 2007. Approximately two months later, ECC filed suit in federal court against Bear Stearns, seeking damages for Bear Stearns' alleged breach of the APA by, among other things, not buying all of the loans Encore originated during the pre-closing period before the due dates of the loans' first payments. The case settled in July 2009, with ECC receiving $15 million.

B.    *ECC Sues Latham and Manatt, Who Compel Arbitration*

In January 2010 ECC filed this action in state court against Latham and Manatt, asserting causes of action for legal malpractice, breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing. ECC alleged that poor drafting by Latham and Manatt of Section 7 of the APA had enabled Bear Stearns to refuse to buy loans promptly during the pre-closing period, forced ECC to sue Bear Stearns to recover ECC's resulting losses, and weakened ECC's position in that litigation, leaving ECC to settle for much less than the $48 million it sought. ECC also asserted Latham and Manatt "failed to make full written disclosure of conflicting interests to [ECC] and to obtain [ECC's] informed written consent," but made no specific factual allegations to support this assertion.

Manatt moved to compel arbitration, citing arbitration provisions in an April 2003 engagement agreement between Manatt and Encore and a January 2007 engagement agreement between Manatt and ECC Capital. Latham also moved to compel arbitration, citing an arbitration provision in a March 2005

5

engagement agreement between Latham and ECC Capital, although Latham conceded it lacked a fully executed copy of that agreement. Latham also argued it could compel arbitration under ECC's engagement agreements with Manatt because ECC alleged Latham acted as Manatt's agent (and vice versa) in providing legal services to ECC.

In opposing the motions, ECC did not dispute the validity of the engagement agreements or arbitration provisions cited by Manatt. Rather, ECC argued it had no enforceable arbitration agreement with Latham and, because ECC's claims against Latham and Manatt arose out of the same transaction, the court should try the claims against both defendants pursuant to Code of Civil Procedure section 1281.2, subdivision (c),[3] to avoid conflicting rulings on common issues of law and fact. The court granted the motions to compel arbitration "under the Manatt contract."

In October 2010 ECC initiated arbitration against Latham and Manatt before the American Arbitration Association (AAA), asserting the same claims it had asserted in court.[4] Shortly before the arbitration hearing began in January 2013, ECC settled with Latham.

---

[3]     Undesignated statutory references are to the Code of Civil Procedure.

[4]     As ECC had alleged in its complaint, ECC alleged in its arbitration demand, on information and belief and without supporting factual allegations, "that the Manatt Respondents failed to make full written disclosure of conflicting interests to [ECC] and to obtain [ECC's] informed written consent." The arbitration demand also asked for attorneys' fees and costs "pursuant to the terms of the 2007 Manatt Engagement Letter."

6

C.    *ECC Takes Discovery on Manatt's Alleged*
      *Conflict of Interest*

The arbitrator limited discovery to requests for production of documents and depositions.  One category of documents ECC requested from Manatt was "[a]ll DOCUMENTS concerning [Manatt's] COMMUNICATIONS or analysis of conflicts of interest concerning the representation of ECC in connection with the BEAR STEARNS TRANSACTION."  ECC also requested billing records for any legal services Manatt provided to The Bear Stearns Companies, Inc. and its affiliates, including Bear Stearns Residential Mortgage Corporation and EMC Mortgage Corporation, from 2004 through 2008.

When Manatt objected to these requests, ECC sought to compel the production of responsive documents on the grounds that the documents were necessary to discover whether Manatt had a conflict of interest, arising from legal services provided to Bear Stearns when Manatt represented ECC in the sale of Encore, and whether Manatt had obtained conflict waivers.  ECC cited a September 2006 email exchange among Marshall, Manatt partner Robert Sherman, and ECC Capital's general counsel, Alanna Darling, in which Darling asked Marshall and Sherman to provide comments on Bear Stearns' proposed amendments to an agreement relating to the transaction for the sale of Encore. In doing so, Darling commented, "I think you have a waiver for these agreements but if not, let me know."  Sherman responded that he was "not aware of any waiver from Bear."  Marshall replied, "I think we talked about getting a waiver the last time this came up, but because of the timing we did not do the work. At least that's what I recall.  I think we could get the waiver readily.  (Rob, the best person to connect with Bear on this is

7

[Manatt partner] Barbara Polsky.)" Darling responded, "Please do try to get a waiver."[5]

After holding at least two hearings on these and other discovery issues, the arbitrator sustained Manatt's objection to ECC's request for Manatt's billing records. And although the arbitrator directed Manatt to supplement its response to ECC's request for communications or analyses concerning conflicts of interest in connection with representing ECC in its sale of Encore, the arbitrator ruled Manatt did not have to search Barbara Polsky's emails or use her name as a search term when searching the email accounts of other custodians of record.[6]

---

[5] At her deposition on January 10, 2012, Darling recalled that during the negotiation of the sale of Encore the "issue" of a conflict waiver "came up" with both Latham and Manatt because both firms had an attorney-client relationship with "Bear." Darling stated that such an issue was "pretty standard with a large company like Bear, that they would be conflicted. There . . . would need to be a conflict waiver at some point."

[6] The arbitrator did not state his reasons for these rulings. The record suggests, however, that the ruling regarding the search of Polsky's email account and use of her name as a search term was based, at least in part, on Manatt's assertions that (a) Polsky provided no legal services to ECC, (b) searching her email and using her name as a search term when searching other email accounts would generate "an enormous number" of nonresponsive documents and privileged communications with other Manatt clients, and (c) "any relevant emails between the Manatt lawyers who actually worked on the APA Transaction and Ms. Polsky . . . would be collected through searching the mailboxes of the Manatt lawyers who worked on the APA transaction using search terms relevant to the case."

8

When ECC later deposed Sherman, counsel questioned him about his September 2006 email exchange with Darling and Marshall, the conflict waiver referred to in the exchange, and any communications he may have had with Polsky concerning the issue. Sherman could not recall communicating with Polsky about such a waiver or actually seeing one, but he believed Manatt obtained one because Manatt was "not in the habit of doing work when we had a conflict without getting a waiver."

Counsel for ECC asked similar questions when deposing Marshall. When asked whether "Bear had historically been a client of Manatt," Marshall answered, "From time to time," including at the time of the September 2006 email exchange with Darling. Marshall stated she recalled Manatt sought and obtained a conflict waiver from ECC in connection with the sale of Encore to Bear Stearns. She also stated that in February 2007, when ECC began considering litigation against Bear Stearns to enforce ECC's understanding of Section 7 of the APA, Marshall told ECC she could not bring one of Manatt's litigation partners to a meeting to discuss the issue because Manatt's conflict waiver from "Bear" excluded litigation work.

ECC did not seek to depose Polsky or any other Manatt attorneys, though the arbitrator did not prohibit ECC from doing so. Nor did ECC call Polsky as a witness at the arbitration hearing.

ECC designated Robert Kehr as its expert on issues of standard of care, professional ethics, and professional responsibility. When counsel for Manatt asked Kehr during his deposition whether he was giving any opinion in the case regarding a conflict of interest on the part of Manatt, Kehr said he was not. Consistent with this answer, Kehr gave no opinion

9

during the arbitration hearing that Manatt had any conflict of interest.

D.    *The Arbitration Hearing and the Interim Award*

The arbitration hearing was held from January 15 to March 1, 2013. In advance of the hearing, ECC submitted a brief setting forth all its contentions, including its principal contention that Manatt was negligent in drafting the APA because, among other reasons, Manatt failed to include a provision obligating Bear Stearns to purchase the loans Encore originated before the first payments on those loans were due. ECC's brief did not contend Manatt had any conflict of interest or fraudulently induced or coerced ECC to sign the 2007 engagement agreement.

The arbitrator heard testimony from numerous witnesses and considered approximately 2,000 pages of deposition testimony. At no time did ECC argue or seek to present evidence that Manatt had a conflict of interest or induced ECC through any inappropriate means to sign the 2007 engagement agreement. In fact, during the hearing, counsel for ECC "expressly disavowed that [ECC] was seeking testimony to claim that Manatt had a conflict or breached some fiduciary duty with respect to conflicts." At the conclusion of the hearing, the parties submitted closing briefs, and on May 14, 2013 the arbitrator heard closing arguments. Again, ECC made no mention of any conflict of interest, fraud, or coercion on the part of Manatt.

On August 1, 2013 the arbitrator issued a 49-page interim arbitration award, denying all of ECC's claims against Manatt. The arbitrator found ECC had not proved by a preponderance of the evidence that Manatt was negligent in drafting Section 7 or that any losses ECC may have incurred in the transaction with

10

Bear Stearns were the fault of Manatt. The arbitrator deemed Manatt the prevailing party in the arbitration and directed it to submit an application to recover its reasonable attorneys' fees, expert fees, and costs, as provided in the 2007 engagement agreement.

    E.    *ECC Requests Disqualification of the Arbitrator*

On October 30, 2013, before Manatt filed its application for fees and costs, ECC wrote the arbitrator and AAA requesting the arbitrator's disqualification from the proceeding and suggesting there were grounds to vacate the interim award. ECC contended the arbitrator failed to comply with his disclosure obligations by not disclosing his "role as a Panelist in a prior matter involving [Manatt] that took place in 2006." ECC identified that matter as *Tom Leykis v. Damian Macafee dba QTK Internet Name Proxy*, a Uniform Domain Name Dispute Resolution Policy (UDRP) proceeding before the National Arbitration Forum in which the arbitrator served as a panelist and the claimant was represented by Jill M. Pietrini, an attorney who at that time (and until approximately January 2012) worked for Manatt.[7] ECC stated it "only recently" discovered these facts and believed the arbitrator failed to disclose "other matters" he was statutorily required to disclose. In letters to AAA in October and November 2013, Manatt responded to ECC's contentions and asked the arbitrator not to disqualify himself.

On November 12, 2013 the arbitrator notified the parties by letter that he did not intend to disqualify himself. The arbitrator stated that, at the time he undertook the present

---

[7]    UDRP proceedings, as we will discuss in more detail, involve disputes over the use of Internet domain names.

11

matter in December 2010, "[he] was unaware that an attorney from [Manatt] had been listed as counsel in an uncontested, documents only domain name dispute arbitration, in which [he] served as an arbitrator almost five years previously." He stated that since 2000 he had served approximately 450-500 times as an "arbitrator" in UDRP proceedings administered by the National Arbitration Forum, almost all of which were, like the *Leykis* matter, uncontested.

The arbitrator explained his involvement with those proceedings: "These cases are documents only matters in which, as an arbitrator, I have no direct contact with the parties or their representatives. In fact, my total involvement in preparing a decision takes well less than one hour. When an uncontested matter is assigned to me, I access a web-based portal where I can download the documents pertaining to the matter. The complaining party files a complaint online, there is[]in addition a letter assigning the matter to an arbitrator, a staff memorandum proposing a resolution to the matter, and a template of the decision. [¶] . . . I do not add [the names of the parties or their representatives] to the template or give any consideration to the names, if any, of a party representative. . . . The staff memorandum proposes a resolution to all of the issues. . . . In the case of uncontested matters, like the *Leykis* case, the resolutions proposed in the staff memorandum are almost always adopted with only modest editing."

The arbitrator further explained: "Because of the sheer volume of these cases, the fact that they are uncontested, documents only matters, in which no consideration is given to any one listed as a party representative, I can state with absolute certainty that when I filled out the disclosure information in this

12

case I was unaware that an attorney from the Manatt firm had been listed as a party representative in one of those matters. [¶] I do maintain an excel spreadsheet where I record contested arbitrations and mediations. I do not include in that excel spreadsheet these domain name matters because they are uncontested, documents only matters, where identification of a party, or a party representative, is completely irrelevant to the resolution of the dispute. So, when I did my customary due diligence by reviewing the excel spreadsheet, the Manatt firm did not appear."

On November 18, 2013 ECC sent a second letter to AAA, requesting AAA disqualify the arbitrator and vacate the interim award, and describing "additional pertinent evidence." ECC stated that after receiving the arbitrator's letter it searched the National Arbitration Forum's online database and discovered that in 2002 the arbitrator was a panelist in *Kevin Spacey v. Alberta Hot Rods*, a contested proceeding in which the claimant, represented by Manatt, prevailed. ECC conceded the *Spacey* matter was "not within the five year disclosure period," but argued it was relevant to ECC's consideration of whether to allow the arbitrator to serve in this case, and ECC would have discovered and considered it had the arbitrator disclosed the *Leykis* matter as ECC contended was required. On December 11, 2013 AAA notified the parties it was denying ECC's request to disqualify the arbitrator.

F.    *The Trial Court Confirms the Interim Award*

In December 2013 ECC filed a petition to vacate the interim award and disqualify the arbitrator, contending the arbitrator failed to comply with his statutory disclosure

13

obligations.  In January 2014 Manatt filed a competing petition to confirm the interim award.  In February 2014 ECC amended its petition to include a request to vacate the orders compelling arbitration.

In its amended petition ECC argued the court should vacate the orders compelling arbitration and the interim award because ECC's 2007 engagement agreement with Manatt, which ECC referred to as "the Arbitration Agreement,"[8] was procured by Manatt's "fraud [and] coercion."  ECC contended the evidence of Manatt's fraud and coercion emerged only during the arbitration hearing, when Marshall testified Section 7 of the APA was (in ECC's words) "drafted to provide only a discretionary obligation on the part of Bear."  According to ECC, this testimony conflicted with Marshall's previous statements indicating she shared ECC's view that Section 7 "required Bear to purchase and securitize monthly all the loans originated during the pre-closing period."  This testimony also established, according to ECC, that Manatt engaged in fraud and coercion when it requested ECC to sign an engagement agreement in January 2007, "on the eve of" ECC and Bear's closing their transaction under the APA.  ECC

---

[8]      ECC stated in a footnote:  "Plaintiff Performance Credit LLC, then known as Encore Credit Corporation, had signed an engagement letter with Manatt in April 2003, with different arbitration provisions than the ECC agreement, and not calling for AAA arbitration.  That fee agreement pertained to a different representation matter.  The Court ordered both Performance Credit and ECC to AAA arbitration."  This is the only explanation in the record or the briefs for why the parties do not address what effect, if any, the 2003 engagement agreement between Manatt and Encore might have on the issues in this appeal.

14

contended Marshall's testimony demonstrated that, at the time Manatt asked ECC to sign the engagement agreement, Marshall knew "she had not performed the job she was specifically hired to do," "was concealing her belief that Bear's obligations were 'discretionary,'" and knew "a potential claim [for legal malpractice] would be likely."

ECC also argued the court should vacate the interim award and the orders to compel arbitration because the 2007 engagement agreement was "illegal." ECC argued the agreement was illegal because Manatt had an undisclosed conflict of interest arising from its dual representation of ECC and "Bear," for which Manatt had not obtained a written waiver from ECC.

On March 12, 2014 the trial court denied ECC's amended petition. The court also granted Manatt's petition to confirm the interim award.

G.      *The Arbitrator Issues His Final Award*

In March 2014 Manatt presented the arbitrator with its application for more than $8 million in attorneys' fees, expert fees, and costs as the prevailing party in the arbitration. ECC opposed the application on several grounds, including that the 2007 engagement agreement under which Manatt sought fees and costs was unenforceable because Manatt committed ethical violations in obtaining it. ECC again contended Manatt had an undisclosed conflict of interest.

In January 2015 the arbitrator issued his final award, granting Manatt's application for attorneys' fees, expert fees, and costs in the amount of $6,982,621. In his 23-page ruling, the arbitrator discussed at length ECC's contention that the 2007 engagement agreement was unenforceable. The arbitrator

15

rejected that contention because there was no evidence Manatt had a conflict of interest, ECC had forfeited the argument by failing to raise it during the arbitration hearing, and ECC had sought to enforce the terms of the 2007 engagement agreement when it requested attorneys' fees, expert fees, and costs in its arbitration demand.

In concluding Manatt had no conflict of interest, the arbitrator noted Marshall had submitted a declaration to the effect that "Manatt never represented any of the companies affiliated with [Bear Stearns & Co., Inc.] involved in the APA: [Bear Stearns Residential Mortgage Corporation], EMC [Mortgage Corporation], and Bear Stearns Mortgage Capital Corporation," but that "Manatt did represent previously [Bear Stearns & Co., Inc.] in unrelated matters." The arbitrator stated that, because of the importance of these facts to the issues ECC raised, he had directed counsel for Manatt to conduct further inquiry, and after consulting with Manatt's managing partner, counsel for Manatt had sent an email to the arbitrator and counsel for ECC stating the following:

"'During the period 1987-89, but not thereafter, Manatt represented an entity named Bear Stearns Mortgage Capital, which apparently was one of the many Bear subsidiaries. The counterparty to the repo agreement in the APA transaction was an entity named Bear Stearns Mortgage Capital Corp. We do not yet know if the two entities are the same entity with a name change, or different entities. I have also been informed that Manatt represented PMG Securities Corporation (not a Bear entity) in an NASD arbitration in which another Bear affiliate, Bear Stearns Securities Corp., was a co-defendant. I am informed that PMG Securities Corporation indemnified Bear

16

Stearns Securities Corp. and that Manatt appeared in the arbitration as counsel for both.'"

"Thus," the arbitrator observed, "counsel for Manatt acknowledged that Ms. Marshall's declaration was false."[9] The arbitrator then noted he had asked the parties during the hearing on Manatt's application for attorneys' fees "whether they believed further investigation and/or an evidentiary hearing was necessary to establish the precise nature of Manatt's prior representation of any Bear Stearns affiliated entity. Counsel for the parties stated they were satisfied with the record as it stood, taking into account this most recent communication from Manatt's counsel."

The arbitrator concluded, "Although it appears Manatt previously had an attorney client relationship with [Bear Stearns & Co., Inc.] and Bear Stearns Mortgage Capital (potentially the same entity as one of the parties engaged in the negotiation of the APA), no such relationships existed in 2006 when Manatt represented ECC in drafting portions of the APA. To the extent there are unknown issues regarding the nature of these relationships or the reason why Manatt obtained a waiver letter from Bear Stearns, the gap in the evidence was caused by the delay on the part of ECC in raising its allegations of unethical conduct." (Fns. omitted.)

The arbitrator also rejected ECC's argument that Manatt's agreement not to represent ECC in litigation relating to the APA constituted a conflict. The arbitrator noted that, in response to

---

[9] This appears to be an overstatement. The email from counsel for Manatt leaves open the possibility Marshall was correct in stating Manatt never represented any of the three Bear Stearns entities involved with the APA.

17

the September 2006 email exchange in which Darling requested that Sherman and Marshall "[p]lease do try to get a waiver," Manatt prepared a conflict waiver letter that a senior managing director of Bear Stearns & Co., Inc. subsequently signed.[10]  It was this conflict waiver letter to which Marshall was referring when in January 2007, in response to a request from ECC that she bring a litigator to a meeting to discuss disputes over the APA, Marshall wrote:  "I took a look at the conflict waiver letter that we got from Bear Stearns, and it specifically excludes representation in a litigation."  The arbitrator concluded the conflict waiver letter thus "amounted to a 'relationship' with [Bear Stearns & Co., Inc.] which apparently extended to [Bear Stearns Residential Mortgage Corporation] wherein Manatt agreed not to engage in any litigation relating to the APA."

The arbitrator determined this "relationship," however, did not constitute a conflict of interest because there was no evidence it materially and adversely affected Manatt's representation of ECC or ECC's interests.  The arbitrator noted the 2007 engagement agreement between ECC and Manatt defined the "matter" for which ECC was retaining Manatt as "general corporate advice" and all the evidence in the arbitration "showed that Manatt's role was limited to drafting and negotiating selected portions of the APA documentation."   In addition, the arbitrator observed, ECC "promptly retained extremely

---

[10]     The arbitrator noted the letter was not part of the record of the proceeding because counsel for Manatt contended it was privileged, and "Manatt has not been able to identify anyone with the current holder of the privilege, JP Morgan Chase, to authorize release of the letter."

competent counsel" to represent it in litigation with Bear Stearns.

H.    *The Trial Court Confirms the Final Award*

On February 24, 2015 ECC and Manatt filed respective petitions to vacate and confirm the final arbitration award.  ECC argued the trial court should vacate the final award under section 1286.2, subdivision (a), because, among other reasons, the arbitrator exceeded his powers by awarding fees and costs pursuant to an illegal agreement, the final award was procured by "fraud, coercion and/or undue means," and the arbitrator failed to disclose a ground for disqualification of which he was aware.

On March 23, 2015 the trial court denied ECC's petition to vacate the final award and granted Manatt's petition to confirm it.  Neither party requested a statement of decision.   On July 13, 2015 the trial court entered judgment in favor of Manatt and against ECC in the amount of $6,982,621.  ECC timely appealed.

## DISCUSSION

ECC argues the trial court erred in confirming the interim award because the arbitrator violated mandatory disclosure rules.  ECC also contends the trial court erred in confirming the final award because the arbitrator exceeded his powers by enforcing an illegal agreement, Manatt procured the final award by fraud or undue means, and the arbitrator refused to allow ECC to take discovery and present evidence relating to Manatt's alleged conflict of interest.

19

A.    *Standard of Review*

Judicial review of an arbitration award is ordinarily limited to the statutory grounds for vacating an award under section 1286.2 and correcting an award under section 1286.6. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 12-13; *Sunline Transit Agency v. Amalgamated Transit Union, Local 1277* (2010) 189 Cal.App.4th 292, 303.)  "In relatively rare instances the court may also vacate or correct an arbitration award, '[w]here "according finality to the arbitrator's decision would be incompatible with the protection of a statutory right" or where the award contravenes "an explicit legislative expression of public policy."'"  (*Sunline Transit Agency*, at p. 303; see *Singerlewak LLP v. Gantman* (2015) 241 Cal.App.4th 610, 615-617.)

"'On appeal from an order confirming an arbitration award, we review the trial court's order (not the arbitration award) under a de novo standard.  [Citations.]  To the extent that the trial court's ruling rests upon a determination of disputed factual issues, we apply the substantial evidence test to those issues.'" (*Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1217; accord, *Condon v. Daland Nissan, Inc.* (2016) 6 Cal.App.5th 263, 267; see *Sunline Transit Agency*, *supra*, 189 Cal.App.4th at p. 303 ["""the general rule [is] that 'an arbitrator's decision cannot be reviewed for errors of fact or law""""].)  "[T]he question whether the arbitrator exceeded his powers and thus whether we should vacate his award on that basis is generally reviewed on appeal de novo." (*Richey v. AutoNation, Inc.* (2015) 60 Cal.4th 909, 918, fn. 1.)

Although there is a split of authority on whether a statement of decision is required on a petition to confirm an

20

arbitration award when a party requests one,[11] courts uniformly hold that a statement of decision is not required when there is no such request. (See *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 237 ["[w]hen a trial court denies a motion to compel arbitration, a party may request the court to provide a statement of decision explaining the factual and legal basis for its decision," but "[n]o statement of decision is required if the parties fail to request one"]; *Agri-Systems, Inc. v. Foster Poultry Farms* (2008) 168 Cal.App.4th 1128, 1134 [trial court confirming an arbitration award "has no obligation to prepare a statement of decision unless a party requests one"].) Where, as here, neither side asked for, and the trial court did not issue, a statement of decision, "the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues. [Citations.] The appellate court then reviews the implied factual findings under the substantial evidence standard." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 60; see *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1135; *Agri-Systems, Inc.*, at p. 1135 [applying the rule to an order confirming an arbitration award].)

---

[11] Compare *Rebmann v. Rohde* (2011) 196 Cal.App.4th 1283, 1294 [a statement of decision is not required for an order granting or denying a petition to confirm an arbitration award] with *Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 687 ["the Legislature intended to require the trial court to issue a statement of decision, upon proper request under section 632, when denying a petition to compel arbitration"].

B.     *ECC Did Not Establish the Arbitrator Violated*
       *Mandatory Disclosure Rules*

Section 1286.2, subdivision (a)(6)(A), provides the court must vacate an arbitration award if the arbitrator "failed to disclose within the time required for disclosure a ground for disqualification of which the arbitrator was then aware."  (See *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 394 [under section 1286.2, subdivision (a)(6), "an arbitrator's failure to make a required disclosure requires vacation of the award, without a showing of prejudice"].)  Specifically, as relevant here, "[w]ithin 10 days of receiving notice of his or her nomination to serve as a neutral arbitrator, the proposed arbitrator is required, generally, to 'disclose all matters that could cause a person aware of the facts to reasonably entertain a doubt that the proposed neutral arbitrator would be able to be impartial.'"  (*Haworth*, at p. 381, quoting § 1281.9, subd. (a); accord, *United Health Centers of San Joaquin Valley, Inc. v. Superior Court* (2014) 229 Cal.App.4th 63, 75; see § 1281.9, subds. (a), (b).)

Section 1281.9, subdivision (a), enumerates specific matters the arbitrator must disclose.  (See *Haworth*, *supra*, 50 Cal.4th at p. 381; *United Health Centers*, *supra*, 229 Cal.App.4th at p. 75.) Subdivision (a)(4) of that section requires disclosure of "[t]he names of the parties to all prior or pending noncollective bargaining cases involving any party to the arbitration or lawyer for a party for which the proposed neutral arbitrator served or is serving as neutral arbitrator, and the results of each case arbitrated to conclusion, including the date of the arbitration award, identification of the prevailing party, the names of the parties' attorneys and the amount of monetary damages awarded, if any."  "Prior cases" in this description means "noncollective

bargaining cases in which an arbitration award was rendered within five years prior to the date of the proposed nomination or appointment." (*Id.*, subd. (d).) "Lawyer for a party" means "any lawyer or law firm currently associated in the practice of law with the lawyer hired to represent a party." (*Id.*, subd. (c).)

To similar effect, subdivision (a)(2) of section 1281.9 requires the arbitrator to disclose "[a]ny matters required to be disclosed by the ethics standards for neutral arbitrators adopted by the Judicial Council pursuant to this chapter." Those Ethics Standards require an arbitrator to disclose whether he or she "is serving or, within the preceding five years, has served . . . [a]s a neutral arbitrator in another prior or pending noncollective bargaining case involving a party to the current arbitration or a lawyer for a party." (Ethics Standards, std. 7(d)(4)(A)(i); see *United Health Centers*, *supra*, 229 Cal.App.4th at p. 76, fn. 4.)

ECC contends the *Leykis* matter—the UDRP proceeding in which the arbitrator participated within the previous five years and a Manatt lawyer represented the claimant—was a prior noncollective bargaining case that section 1281.9, subdivisions (a)(2) and (a)(4), required him to disclose within 10 days of his proposed appointment to serve as arbitrator in this case. Because he failed to do so, ECC argues, the trial court erred in not vacating the interim award pursuant to section 1286.2, subdivision (a)(6)(A).

As Manatt points out, however, section 1286.2, subdivision (a)(6)(A), provides for vacatur only where the arbitrator fails to disclose a ground for disqualification "of which the arbitrator was then aware." *Casden Park La Brea Retail LLC v. Ross Dress For Less, Inc.* (2008) 162 Cal.App.4th 468 illustrates this knowledge requirement. After the trial court in that case vacated an

23

arbitration award because the court found the neutral arbitrator improperly failed to disclose business dealings between his employer and a party (and that party's arbitrator), the Court of Appeal reversed. (*Id.* at p. 470.) Acknowledging section 1281.9, subdivision (a)(6), required disclosure of "'[a]ny professional or significant personal relationship the proposed neutral arbitrator . . . has or has had with any party to the arbitration proceeding,'" the court in *Casden* nevertheless held vacating the arbitration award under section 1286.2, subdivision (a)(6), was improper because the arbitrator did not know of the business dealings when he made his disclosures. (*Casden*, at pp. 476-477.) The court explained: "[A]n arbitration award may be vacated only upon a finding that a neutral arbitrator failed to disclose a ground for disqualification 'of which the arbitrator was then aware' [citation], and this requirement of scienter is a deliberate expression of the Legislature's intent to prevent the undoing of an arbitration award based upon an arbitrator's unknowing failure to disclose information." (*Id.* at p. 477.) Because no one disputed the arbitrator was unaware of the business dealings, the court observed, "it follows that [the arbitrator] had no duty to disclose those transactions." (*Id.* at pp. 477-478.)

The parties here similarly do not dispute that at the time of his disclosures the arbitrator was not aware a former Manatt lawyer had participated in the *Leykis* UDRP matter. As the arbitrator stated in his letter responding to ECC's request that he disqualify himself: "[L]et me state unequivocally that at the time I undertook this matter in December 2010 I was unaware that an attorney from [Manatt] had been listed as counsel in [the *Lyekis* matter]. The letter I received from [ECC] was the first, and only time, I became aware that an attorney from Manatt had

24

been listed as a party representative in [that] matter." Because the arbitrator was not aware a former Manatt lawyer participated in the *Leykis* UDRP proceeding, his failure to disclose that matter is not a ground for vacating the interim award under section 1286.2, subdivision (a)(6)(A).

ECC argues that, although the arbitrator may not have been aware a Manatt lawyer participated in the *Leykis* UDRP proceeding, he should have been aware, and therefore his failure to disclose the matter requires vacating the interim award. As ECC puts it: "An arbitrator cannot render himself 'unaware' of arbitrations he is required to disclose by failing to inform himself before making disclosures." ECC points to what the court in *Advantage Medical Services, LLC v. Hoffman* (2008) 160 Cal.App.4th 806 referred to as a "duty of inquiry" imposed by the Ethics Standards. (*Id.* at p. 819.) The court in *Advantage Medical Services* noted: "Standard 9(a) of the Standards clearly states: 'A person who is nominated or appointed as an arbitrator must make a reasonable effort to inform himself or herself of matters that must be disclosed under standards 7 and 8.'"[12] (*Id.* at p. 818.) ECC argues these authorities required the arbitrator to inform himself of the *Leykis* matter by reviewing the UDRP proceedings in which he participated, and ECC contends his failure to do so (and resulting failure to discover and disclose the *Leykis* matter) requires vacatur.

There are two problems with ECC's argument, one legal and one factual. As a legal matter, ECC does not explain how the arbitrator's failure to disclose a ground for disqualification of which the arbitrator was not aware but reasonably should have

---

[12]    The only disclosure requirement under standards 7 and 8 that ECC identifies as applicable is standard 7(d)(4)(A).

been requires vacating an award under section 1286.2, subdivision (a)(6)(A), when that statute requires vacating an award only when an arbitrator fails to disclose a ground for disqualification of which he or she was actually aware. Section 1286.2, subdivision (a)(6)(A), requires actual awareness, not inquiry or constructive awareness. (See Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2016) ¶ 7:50 ["[t]he arbitrator's duty to investigate for conflicts is narrower than the duty to disclose known conflicts"].) As a factual matter, because the trial court did not issue a statement of decision, we must presume the court found the arbitrator made a reasonable effort to inform himself of matters he was required to disclose and therefore it was not unreasonable for him to exclude the UDRP proceedings from his pre-disclosure review.

That implied factual finding is supported by substantial evidence. The arbitrator explained it was not his practice to include the UDRP proceedings in his review because of the nature and number of those proceedings, and he stated this practice comported with his "understanding of [his] ethical duties and disclosure obligations under California law." Manatt submitted declarations from three people with relevant experience and expertise who concurred with the arbitrator's approach. One of those, David E. Sorkin, a panelist in approximately 400 UDRP proceedings and an arbitrator in approximately 90 private contractual arbitrations, is a law professor whose scholarship focuses on "Internet law, UDRP mandatory administrative proceedings[,] and arbitration laws and practices." Sorkin explained that any person contesting another person's Internet domain name registration can initiate

26

a UDRP proceeding.  He then highlighted what he considered important differences between such a proceeding and those proceedings an arbitrator would normally recognize as "arbitrations" subject to the disclosure requirements under section 1281.9 and the Ethics Standards.  For example, UDRP rules refer to UDRP proceedings as "mandatory administrative proceedings," not "arbitrations," and refer to the people who decide such disputes as "panelists," not "arbitrators."  UDRP proceedings are non-binding, in that "[e]ither side can file a court action at any time, before, during or after a decision."  And UDRP proceedings "typically involve no in-person or telephonic hearings, no witnesses, no discovery, and no contact with the panelist."  Given these characteristics, Sorkin opined, "it would be reasonable for an arbitrator to believe that serving as a panelist in a UDRP mandatory administrative proceeding would not trigger a required arbitration disclosure under California's Ethics Standards or [section] 1281.9."   The other two expert declarations on this subject included similar statements.

ECC cites no authority suggesting the arbitrator's understanding of his disclosure obligation was unreasonable.  In fact, ECC suggests whether a UDRP proceeding is, as it contends, an "arbitration" subject to mandatory disclosure under section 1281.9, subdivision (a)(4), and the Ethics Standards, is an issue of first impression in California.  That ECC has found cases where arbitrators and some federal courts outside California may have referred to UDRP proceedings as "arbitrations," without addressing and analyzing whether that label is appropriate, is not dispositive.  (See, e.g., *Storey v. Cello Holdings, L.L.C.* (2d Cir. 2003) 347 F.3d 370, 381, 393; *Retail Services, Inc. v. Freebies Pub.* (E.D.Va. 2003) 247 F.Supp.2d 822, 825; see also *Borikas v.*

27

*Alameda Unified School District* (2013) 214 Cal.App.4th 135, 164, fn. 34 ["a case is not authority for a proposition it does not address"].)  Moreover, although there are no cases addressing whether a UDRP proceeding is an "arbitration" subject to disclosure under the provisions of the California Arbitration Act (§ 1280 et seq.), federal cases addressing whether a UDRP proceeding is an "arbitration" under the Federal Arbitration Act (9 U.S.C. § 1 et seq.) have concluded it is not.  (See *Dluhos v. Strasberg* (3d Cir. 2003) 321 F.3d 365, 370-373; *Parisi v. Netlearning, Inc.* (E.D.Va. 2001) 139 F.Supp.2d 745, 751-753; see also Speidel, *ICANN Domain Name Dispute Resolution, the Revised Uniform Arbitration Act, and the Limitations of Modern Arbitration Law* (2002) 6 J. Small & Emerging Bus. L. 167, 171-172 ["the UDRP is not an arbitration within the scope of American statutory arbitration law, whether that law is found in international treaties, the FAA, or state arbitration law"], fns. omitted.)

Finally, ECC suggests the arbitrator should have disclosed, at a minimum, that he had participated in numerous UDRP proceedings that he did not review for required disclosures, so that the parties could have undertaken their own review of and investigation into those matters.  That might have been a better arbitrator disclosure practice.  But ECC cites no authority for vacating an arbitration award on that ground.  The trial court did not err when it denied ECC's petition to vacate the interim award based on the arbitrator's alleged failure to make mandatory disclosures.

C.   *ECC Forfeited Its Argument the 2007*
     *Engagement Agreement Was Illegal*

Section 1286.2, subdivision (a)(4), requires a court to vacate an arbitration award if it determines "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted."  ECC contends the trial court erred in refusing to vacate the final award because, in making the award, the arbitrator exceeded his powers and violated a well-defined public policy by "enforcing an illegal agreement."  Specifically, ECC argues that, in awarding fees and costs under the 2007 engagement agreement, the arbitrator gave effect to a contract that was illegal because Manatt procured it in violation of Rules 3-310(B) and 3-310(C) of the Rules of Professional Conduct and section 6106 of the Business & Professions Code.

Rule 3-310(B) of the Rules of Professional Conduct prohibits a lawyer from, among other things, accepting or continuing "representation of a client without providing written disclosure to the client where . . . [the lawyer] has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter."  (Rules Prof. Conduct, rule 3-310(B)(1).)  ECC contends Manatt violated this rule because it represented ECC without providing written disclosure that "Manatt had entered into a 'legal, business . . . or professional relationship' with Bear in 2006 when it contractually committed that it would not represent ECC in litigation."

Rule 3-310(C) of the Rules of Professional Conduct provides that a lawyer must not, "without the informed written consent of each client[,] . . . [a]ccept representation of more than one client in a matter in which the interests of the clients potentially

29

conflict" or "[a]ccept or continue representation of more than one client in a matter in which the interests of the clients actually conflict." (Rules Prof. Conduct, rule 3-310(C)(1)-(2).) ECC contends Manatt violated these provisions by failing to obtain ECC's informed written consent to Manatt's "dual representation" of ECC and "Bear."

ECC also contends Manatt's violation of these Rules of Professional Conduct "means that the [2007 engagement agreement] was obtained in violation of Business & Professions Code Section 6106." That section provides, in relevant part, that a lawyer's "commission of any act involving moral turpitude, dishonesty or corruption . . . constitutes a cause for disbarment or suspension." (Bus. & Prof. Code, § 6106.)

We agree with Manatt, the arbitrator, and the trial court that ECC forfeited these arguments by failing to raise them earlier in the proceedings. *Cummings v. Future Nissan* (2005) 128 Cal.App.4th 321 is instructive. In that case, the appellant received a favorable result at the first level of a "two-tiered" arbitration proceeding, but had that result reversed at the second, "review" level. (*Id.* at p. 323.) After the trial court confirmed the final award, the appellant urged the Court of Appeal to vacate it on the ground the arbitration provision in her employment contract was unconscionable and therefore unenforceable, an argument she had raised for the first time only after losing at the review level of the arbitration. (*Id.* at pp. 323, 327.) The court in *Cummings* held the appellant forfeited the argument because she failed to raise it in her opposition to the motion to compel arbitration. (*Id.* at pp. 329-330.) The court explained: "The forfeiture rule exists to avoid the waste of scarce dispute resolution resources, and to thwart game-playing

30

litigants who would conceal an ace up their sleeves for use in the event of an adverse outcome. . . . Those who are aware of a basis for finding the arbitration process invalid must raise it at the outset or as soon as they learn of it so that prompt judicial resolution may take place before wasting the time of the adjudicator(s) and the parties. . . . . [A] party who knowingly participates in the arbitration process without disclosing a ground for declaring it invalid is properly cast into the outer darkness of forfeiture." (*Id.* at pp. 328-329, fns. omitted.)

In reaching its conclusion, the court in *Cummings* cited *Moncharsh*, *supra*, 3 Cal.4th 1: "*Moncharsh* held that if a party believes the entire contractual agreement or a provision for arbitration is illegal, it must oppose arbitration on this basis before participating in the process or forfeit the claim." (*Cummings*, *supra*, 128 Cal.App.4th at p. 328.) As the Supreme Court stated in *Moncharsh*, "we cannot permit a party to sit on his rights, content in the knowledge that should he suffer an adverse decision, he could then raise the illegality issue in a motion to vacate the arbitrator's award. A contrary rule would condone a level of 'procedural gamesmanship' that we have condemned as 'undermining the advantages of arbitration.'" (*Moncharsh*, at p. 30; see *Reed v. Mutual Service Corp.* (2003) 106 Cal.App.4th 1359, 1372-1373 ["[a]ny claim of illegality must be raised before the arbitrator or it is deemed waived" because "[a] contrary rule might tempt a party to 'play games' with the arbitration and not raise the issue of illegality until and unless it lost"]; see also *Mitchel v. City of Santa Rosa* (N.D.Cal. 2010) 695 F.Supp.2d 1001, 1007 [under *Moncharsh* "a plaintiff who argues that a fee-splitting provision in an arbitration agreement is

31

illegal and in violation of public policy must raise that argument before the arbitration panel or risk waiver of the claim"].)

These principles apply with equal if not greater force in this case. Not only did ECC not oppose the motions to compel arbitration on the ground the 2007 engagement agreement was illegal or otherwise unenforceable, ECC gave every indication going into the arbitration hearing it was abandoning its previous assertion that Manatt had an undisclosed conflict of interest, and during the hearing ECC represented it was not going to present any evidence to establish what it now claims as the basis of its illegality argument. This procedural gamesmanship, as the arbitrator noted, deprived Manatt of the opportunity "during the evidentiary portion of this arbitration to make a record on this issue or retain its own expert on the issue of conflict of interest."

ECC maintains "a claim that a contract is illegal is *never* waived." Not according to the Supreme Court, which in *Moncharsh* stated: "We thus hold that unless a party is claiming (i) the entire contract is illegal, or (ii) the arbitration agreement itself is illegal, he or she need not raise the illegality question prior to participating in the arbitration process, so long as the issue is raised before the arbitrator. Failure to raise the claim before the arbitrator, however, waives the claim for any future judicial review." (*Moncharsh, supra*, 3 Cal.4th at p. 31; see *id.* at pp. 29-31.) In fact, as the Supreme Court has also stated, "the maxim that the illegality of a contract . . . is never waived" appears to concern "the procedural issue whether a defense is waived by failure to assert it in a timely fashion once a lawsuit has commenced," and "it is not clear that *all* issues of illegality in a contract fall within the unwaivable category." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 54, fn. 5; see *Yoo v. Robi* (2005) 126

Cal.App.4th 1089, 1103 ["there may be some exceptions to the rule of unwaivablility"].)

The cases ECC cites are distinguishable for that reason: They concern a failure to raise the illegality of a contract as an affirmative defense to a suit on the contract. (See, e.g., *Fewel & Dawes v. Pratt* (1941) 17 Cal.2d 85, 92; *Yoo v. Robi, supra,* 126 Cal.App.4th at p. 1103 ["a defense of illegality based on public policy is not waived by the defendant's failure to include it as an affirmative defense in the answer to the complaint"]; *In re Guardianship of Prieto's Estate* (1966) 243 Cal.App.2d 79, 86.) As one court explained: "This rule [of non-waiver] applies because, unlike other affirmative defenses which may be waived if not pled, 'when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids.'" (*Yoo,* at p. 1103, fn. omitted.)

In stark contrast, in this case it was ECC that sued on a contract, lost, and only then argued illegality in an attempt to avoid paying fees and costs, despite the fact it was aware of the facts offered in support of that argument from the outset of the case. Such tactics were not present in the cases ECC cites, and, if permitted to succeed here, would severely "'undermin[e] the advantages of arbitration.'" (*Moncharsh, supra,* 3 Cal.4th at p. 30.) Under these circumstances, we are not "unwittingly lend[ing] our] assistance to the consummation or encouragement of what public policy forbids." (*Yoo v. Robi, supra,* 126 Cal.App.4th at p. 1103.)

D. *ECC Did Not Establish Manatt Procured the Final Award by Fraud or Undue Means*

ECC also argues the trial court should have vacated the final award under section 1286.2, subdivision (a)(1), which requires vacatur when an award "was procured by corruption, fraud or other undue means." ECC suggests Manatt procured the award by fraud or undue means "because Ellen Marshall's perjured testimony that no conflict of interests existed had a 'substantial impact' on the arbitrator's decision." The "perjured testimony" to which ECC refers is the declaration from Marshall that the arbitrator, in his ruling, stated Manatt acknowledged was "false."

This argument fails for two reasons. First, the arbitrator gave multiple, alternative grounds for rejecting ECC's contention the 2007 engagement agreement was unenforceable. One of those grounds was that ECC forfeited the argument, a conclusion with which we concur. In determining whether "perjured evidence or evidence procured by undue means" affected an arbitration award, we must presume the arbitrator "'took a permissible route to the award where one exists.'" (*Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 833.)

Second, the arbitrator did not rely at any point on that portion of Marshall's declaration the arbitrator said Manatt acknowledged was "false." What counsel for Manatt's email suggested may have been false was Marshall's statement that Manatt had *never* represented the three affiliated entities involved in the APA transaction: Bear Stearns Residential Mortgage Corporation, Bear Stearns Mortgage Capital Corporation, and EMC Mortgage Corporation. Counsel for Manatt's email acknowledged the possibility that Manatt had

34

represented one of those entities—Bear Stearns Mortgage Capital Corporation—from 1987 to 1989. From this the arbitrator concluded Manatt had not represented any of the three affiliated entities involved in the APA transaction during the time it represented ECC, and the arbitrator rejected aspects of ECC's conflict-of-interest argument on that basis (among others). The arbitrator's ruling did not rely on Marshall's statement that Manatt had never represented Bear Stearns Mortgage Capital Corporation.

E.     *ECC Did Not Establish the Arbitrator Improperly Refused To Hear Evidence*

Finally, ECC perfunctorily contends the arbitrator's "refusal to allow ECC to obtain discovery and present evidence on the nature and extent of Manatt's relationship with Bear" required the trial court to vacate the final award under section 1286.2, subdivision (a)(5), which authorizes a court to vacate an arbitration award when "[t]he rights of the party were substantially prejudiced . . . by the refusal of the arbitrators to hear evidence material to the controversy." ECC cites *Burlage v. Superior Court* (2009) 178 Cal.App.4th 524, 529 for its statement that section 1286.2, subdivision (a)(5), is "'a safety valve in private arbitration that permits a court to intercede when an arbitrator has prevented a party from fairly presenting its case.'" (*Burlage*, at p. 529.)

This argument, too, fails. ECC string-cites to places in the record where the arbitrator ruled adversely to it in disputes over discovery requests or on objections concerning testimony, but ECC does not even attempt to explain how those rulings were unfair. The record shows ECC had a full and fair opportunity to

35

pursue its initial allegation that Manatt had an undisclosed conflict of interest, eventually abandoned that claim, and thereby incurred appropriate limitations on its ability to pursue the claim.  There was no unfairness in that.

## DISPOSITION

The judgment is affirmed.  Manatt is to recover its costs on appeal.


SEGAL, J.

We concur:


ZELON, Acting P. J.


SMALL, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.