Filed 7/18/23  Huang v. Henry Global Consulting CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JUNYANG HUANG et al., | B317537 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos.BC685035, 19STCV37446) |
| v. | |
| HENRY GLOBAL CONSULTING et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge.  Affirmed.

Law Offices of Jeffrey T. Bell and Jeffrey T. Bell for Plaintiffs and Appellants.

Venable, Belinda M. Vega, Witt W. Chang for Defendant and Respondent Las Vegas Resort Holdings, LLC.

Appellants Junyang Huang, Shenghong Cheng, and Xiaole Chen challenge the confirmation of an arbitration award in favor of respondent Las Vegas Resort Holdings, LLC (Holdings) and other parties not involved in this appeal. Appellants contend the award should be vacated because the arbitrators exceeded their authority by determining the arbitrability of and adjudicating claims against non-signatories to the arbitration agreement, adjudicating claims that sought punitive damages, unreasonably limiting the scope of discovery, and resolving the matter without an evidentiary hearing. We reject these contentions and affirm.

**FACTUAL BACKGROUND**

The underlying facts of this case stem from Holdings's renovation and rebranding of the Sahara Hotel and Casino in Las Vegas into the SLS Las Vegas Hotel (the project).[1] Because the facts are complex and of limited relevance to the issues presented on appeal, we provide only a brief overview here, drawn primarily from appellants' second revised statement of claims (SRSOC) and the final arbitration award.

To obtain some of the funding necessary for the costly project, Holdings participated in the United States Citizenship and Immigration Service's EB-5 Immigrant Investor Pilot Program, which provides a path to permanent U.S. residency for foreign nationals who invest at least $500,000 in approved job-creating projects and meet other criteria. It is operated through

---

[1] Holdings's predecessors in interest acquired ownership of the hotel in 2007 and operated the hotel and oversaw the project for several years before ownership transferred to Holdings. Because there is no dispute about Holdings's interest, we use the term "Holdings" to refer to the predecessors in interest as well as Holdings.

various "regional centers" across the country; American Dream Fund, LLC (ADF), operates the Las Vegas Regional Center relevant to this case.

To facilitate investment by foreign nationals, Holdings created a new business entity, SLS Lender, LLC, for the purpose of making a $115 million loan to the project. Holdings also paid for the preparation of a lengthy business plan for SLS Lender, LLC. The business plan included detailed information about the project and its financing, as well as the EB-5 program. It was translated into Chinese and promoted in China along with other marketing documents that contained information provided by Holdings.

After the project commenced, Holdings created a second business entity, SLS Tranche I Lender, LLC (Tranche I), for the purpose of loaning up to an additional $200 million to the project. Holdings prepared an addendum to the business plan as well as a lengthy "confidential private placement memorandum" with additional information about the project and the investment risks it posed. These additional materials were also provided to potential Chinese investors, including appellants. Appellants allege that the materials failed to disclose agreements that Holdings made to pay "finder fees" and "migration agent fees" to marketer Henry Global Consulting Group and other entities.[2]

---

[2] In their briefing here, appellants concede that the private placement memorandum "did state that finder fees would be paid to the marketers of the project by SLS Tranche 1 Lender, LLC and Holdings." They assert, however, that the private placement memorandum "did not state the total amount of the fees, who was receiving the fees, the terms of the fee agreements and did not identify the risk associated with the fees to the viability of the project."

To invest in the project, appellants each purchased one class B "membership unit" in Tranche I for $500,000, and paid an additional administration fee of $45,000. They also each signed a "subscription agreement" prepared by Holdings but signed by Tranche I. Appellants and Tranche I also signed a one-page "member joinder agreement" indicating their willingness to be bound by Tranche I's "operating agreement," including an arbitration provision in the operating agreement and expressly incorporated into the member joinder agreement.

By signing the member joinder agreement, each appellant signed and agreed to be bound by the operating agreement. ADF, the sole class A member of Tranche I, also signed the operating agreement. Holdings did not sign the operating agreement.

The operating agreement provided that "[t]he remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled." It also contained an arbitration provision, which we excerpt below in our discussion of the petition to compel arbitration.

Appellants signed the agreements and made their investments in 2013 (Chen), 2014 (Huang), and 2015 (Cheng). After the renovated and rebranded hotel opened in 2014, it failed to generate revenue as expected and struggled financially; appellants allege this, too, was concealed from them. In June 2017, appellants were informed that the hotel was going to be sold. The class B members of Tranche I twice refused to approve the sale. Appellants allege that the sale ultimately was approved without a vote, and that the terms were concealed from them and were unfavorable both financially and with respect to their efforts to secure permanent U.S. residency.

4

## PROCEDURAL HISTORY

### I.     Complaint

On November 30, 2017, appellants and 57 other class B members of Tranche I filed suit against Holdings and numerous other entities involved in the project, including ADF, the Las Vegas Regional Center, Henry Global Consulting, and 200 Doe defendants.  The suit asserted seven causes of action.  The first cause of action for fraud sounded against "All Defendants" and alleged fraud in the inception, concealment, and false promises.  The second cause of action for breach of fiduciary duty and third cause of action for breach of contract-third party beneficiary sounded against Henry Global Consulting, ADF, the Las Vegas Regional Center, and other defendants (but not Holdings).  The fourth cause of action for permanent injunction sought to stop the sale of the hotel and sounded against Tranche I; ADF; the Las Vegas Regional Center; and Celona Asset Management (USA) Limited, the class A manager of Tranche I.  The fifth cause of action for accounting and sixth cause of action for failure to release records named the same defendants as the fourth cause of action.  The seventh cause of action for violation of Business and Professional Code section 17200 sounded against ADF and Henry Global Consulting.  Plaintiffs prayed for relief including compensatory damages, punitive damages, attorney fees, and injunctive relief.

### II.    Petition to Compel Arbitration

On January 31, 2018, all defendants who had been served, including Holdings, jointly filed a petition to compel arbitration. They asserted that the arbitration provision in the operating agreement required arbitration of plaintiffs' claims. The arbitration provision states, in pertinent part:

5

"Any controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance, or breach of this Agreement shall be submitted to JAMS (hereafter, the 'Arbitration Service') and shall be settled exclusively by arbitration, before a three-member arbitration panel, in accordance with this Section 10.9.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary, or Affiliate of each party, and, when acting within such capacity, any officer, director, member, employee or agent of each party, or any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. Arbitration shall be the exclusive remedy for determining any such dispute, whether in tort, contract, or otherwise, regardless of its nature.  Arbitration shall be governed by the Comprehensive Arbitration Rules and Procedures and International Arbitration Rules (or similar commercial arbitration rules) of the Arbitration Service.  In the event of a conflict between the applicable rules of the Arbitration Service and these procedures, the provisions of these procedures shall govern. . . .

"In the event of a dispute subject to this Section 10.9, (a) the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator, (b) all testimony of witnesses shall be taken under oath, and the admission of evidence shall be governed by the rules of evidence applicable to civil proceedings under applicable law, and (c) a stenographic record shall be kept of all oral hearings.  The remedial authority of the arbitrator shall be the same as, but no greater than, would be the remedial

power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitrator shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgment if the matter had been pursued in court litigation. . . .

"In interpreting this Agreement, the arbitrator shall be bound by and follow the substantive law of the State of Delaware. To the extent applicable and not inconsistent with this Section 10.9, the arbitrator shall apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

". . . The prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator' s compensation), expenses, and attorneys' fees.

"The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. Judgment upon any award rendered by the arbitrators may be entered by any state or federal court having jurisdiction thereof, in accordance with the terms of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. . . ."

Plaintiffs opposed the petition, and defendants filed a reply. The trial court held a hearing, at which it granted the petition on the ground that "questions of arbitrability are properly reserved

7

for the arbitrators." The court stayed the matter as to the moving defendants.

## III. Arbitration

### A. Arbitrability

A panel of three JAMS arbitrators received briefing and held a hearing before ruling on arbitrability. As relevant here, the arbitrators concluded that the parties agreed to arbitrate the pending claims and that parties such as Holdings who were not signatories could participate in the arbitration because "[a]ll causes of action are intertwined with the Operating Agreement, and multiple causes of action name and seek recovery against all Respondents."[3] The arbitrators deferred ruling on the question of whether the arbitration provision's limitation on the their power to award consequential and punitive damages limited the scope of their authority over claims pursuant to which plaintiffs could seek those damages.

### B. Initial Dispositive Motions

According to the final arbitration award, plaintiffs' initial statement of claims (SOC) in the arbitration "contained claims for alleged violations of federal and state securities laws, breach of fiduciary duty, breach of contract, and claims ancillary to those violations. The SOC was the subject of a dispositive motion which the Panel granted in large part with leave to amend as to some claims, but with prejudice as to others." After these

---

[3] By this point in the proceedings, appellants (along with the other plaintiffs participating in the arbitration) had filed a statement of claims against Holdings and others that differed from and expanded upon the complaint filed in the trial court. Notably, they not only retained but also added causes of action against defendants, including Holdings, who had not signed the operating agreement.

8

rulings, plaintiffs dismissed their claims with prejudice against six defendants.

Plaintiffs subsequently filed a revised statement of claims (RSOC) that winnowed their 10 causes of action down to four: fraud, breach of fiduciary duty, accounting, and release of books and records.  Defendants again sought summary disposition. After the motions were briefed and orally argued, the arbitrators requested and received additional documents from defendants and supplemental briefing from plaintiffs.  The arbitrators granted the motion in part, dismissing most of plaintiffs' claims.[4] However, the arbitrators gave plaintiffs leave to amend certain aspects of their claims,  including their allegations that defendants failed to disclose various fee arrangements in the project documents.  Because it is relevant to appellants' argument here, we quote a portion of the ruling:

"Claimants argue (although their allegations are not nearly so specific) that Respondents obligated themselves by early 2013 to pay exorbitant fees to Henry Global and its alter egos that were not reflected in the project cost data.  The most recently submitted documents sew [*sic*] additional confusion as additional parties, who were apparently receiving fees from the Claimants' capital, have now been identified.  Moreover, . . . Claimants alleged that Henry Global (possibly in the guise of other alter ego entities) were [*sic*] entitled to $100 million (20% of loan amount per year over five years), which is not identified in any project

---

[4]     Later, the arbitrators also dismissed with prejudice all claims against Henry Global Consulting, Celona Asset Management (USA) Limited, and Goldstone Advisors Limited, due to plaintiffs' failure to serve and bring those parties into the arbitration.

cost data and, by implication, undermined the safety and value of the investment. Moreover, the RSOC indicates that the concealment of such fees was particularly egregious because the Claimants were misled into thinking that the administrative fee included [in] their investment, totaling $18 million, would cover such fees. The Panel is not satisfied that this issue can be resolved on the merits based on the RSOC, the parties [*sic*] briefing, and the face of the relevant project documents. In the Panel's view, it seems likely that these issues can only be resolved with testimony from participants in the transactions who can provide insight into the structure and operation of the transaction, and the reasons for the loan's ultimate failure. Thus, the Panel concludes that it would be prudent to allow Claimants an opportunity to amend to more particularly spell out this claim, including facts that would preclude the application of the statute of limitations."

### C. Final Dispositive Motion

#### 1. Second Amended Revised Statement of Claims

Plaintiffs filed their SRSOC, which included only three causes of action: fraud, breach of fiduciary duty, and accounting. The arbitrators ordered the three remaining defendants, Holdings, ADF, and Tranche I, to answer the claims.

#### 2. Dismissal of Claims and Discovery Orders on Remaining Claim

During a status conference with the arbitrators, the remaining defendants argued that the breach of fiduciary duty and accounting claims could not proceed due to Henry Global Consulting's dismissal from the matter. They further argued that the fraud claim against them was untimely, and requested

10

the opportunity to resolve the timeliness issue via dispositive motion.  Plaintiffs asserted that the applicable statute of limitations had been tolled, and "argued that a motion could not proceed unless and until discovery was completed on that issue."

The arbitrators subsequently issued an order dismissing the breach of fiduciary duty and accounting claims as defendants requested.  They "further agreed that a dispositive motion could be presented and that Claimants were entitled to discovery" on the statute of limitations issue for the fraud claim.  They ordered "expedited, targeted discovery of documentary evidence bearing on the statute of limitations/tolling question."

Plaintiffs served a request for document production that included requests for "All communications between any Claimant and any Respondent related to: a. EB-5 funding costs[,] b. The KT loan[,] c. The SBE/Stockbridge Loan," "[a]ll documents related to" those same topics, and "[a]ll communications between Respondents and anyone regarding any public filings that reasonably put Claimants on notice of their right to sue in this matter."  Defendants objected to plaintiffs' requests and the parties were unable to compromise, so the arbitrators issued a written "Ruling Re: Panel Ordered Document Production."

In that ruling, the arbitrators characterized the document requests as "extremely broad" requests "that exceed the objective identified by the Panel."  They observed that "[t]he scope of the requested discovery must be evaluated within the context of the issue to be decided – the applicability of the statute of limitations."  They further observed that plaintiffs were seeking to establish tolling due to fraudulent concealment, which "presents a high bar."  The arbitrators continued:  "Whether relevant information was concealed ultimately depends on the

11

substance of the alleged fraud. More specifically, did the Respondents actively conceal information relevant to the statement or statements that Claimants contend were false and misleading. The scope of the claim has been the subject of prior motions made by Respondents and orders issued by the Panel . . . . [T]he Panel concluded that the case could proceed on the theory that certain project costs, known to the Respondents, were not disclosed to the Claimants and that they would not have invested had they known of these costs, including an alleged fee arrangement with Henry Global. The requests at issue must be assessed in the context of the Claimant's [*sic*] fraud theory." The arbitrators reviewed each of plaintiffs' requests and significantly narrowed them.

### 3. Final Arbitration Award

After discovery, the remaining defendants moved for summary disposition of the final fraud claim on statute of limitations grounds. According to the final arbitration award, after the matter was fully briefed, "the Panel conducted a lengthy hearing on the motion" and issued a written ruling granting it. In the final arbitration award, the arbitrators concluded that the statute of limitations on fraud claims had run absent tolling, and plaintiffs failed to meet their burden of establishing the claims were tolled. The arbitrators concluded that the declarations plaintiffs proffered to support their tolling argument "were conclusory and lacking in sufficient detail to be given any weight," and that plaintiffs' expert declaration contained "improper opinion testimony" and "offered no relevant evidence on the issue to be decided." They therefore found "undisputed" that the project documents "contained information disclosing that various marketing agents were being used to raise financing

12

through the EB-5 program for the renovation and development of the SLS Hotel"; that "the marketing agents would be paid substantial fees for services rendered, including fees from both SLS Tranche I Lender from funds collected for administrative fees, and additional fees paid by the project developer"; that the business plan and addendum "disclosed the payment of financing fees in the range of $64 million to $69 million"; and that SEC filings made in 2014 "disclose information regarding the payment of marketing fees, and the financial failure of the project." "For those reasons," the arbitrators concluded that the "cause of action for 'project cost fraud' based on the payment of excessive marketing fees accrued *before* November 30, 2014" and that the fraud claims were time-barred by the applicable three-year statute of limitations.

The arbitrators denied plaintiffs' motion for reconsideration of their ruling on the final dispositive motion. The parties then briefed the issues of fees and costs. The arbitrators ultimately awarded full attorney fees and costs to ADF and Tranche I, and ordered plaintiffs to reimburse Holdings for a portion of the arbitration fees.

**IV.  Petitions to Confirm and Vacate**

Holdings, ADF, and Tranche I filed a petition to confirm the final arbitration award. Plaintiffs countered with a petition to vacate the final arbitration award. The parties filed briefs opposing each other's petitions, and replies in support of their own. In addition to other arguments they have since abandoned, plaintiffs contended the arbitrators exceeded their authority in a variety of ways and dispensed unfair "industrial justice" by limiting discovery and denying plaintiffs a fair hearing.

13

The trial court held a hearing on the dueling petitions and rendered an oral ruling granting the petition to confirm and denying the petition to vacate. The appellate record does not contain a reporter's transcript of the hearing, and no party requested a statement of decision. The court entered judgment in favor of Holdings, ADF, the Las Vegas Regional Center, and Tranche I and against appellants and the 57 other plaintiffs who initially filed the court action.

Appellants timely appealed.

## DISCUSSION

### I. Standard of Review

Judicial review of private arbitration awards is generally limited to the statutory grounds for vacating an award under Code of Civil Procedure section 1286.2 and correcting an award under Code of Civil Procedure section 1286.6. (*ECC Capital Corp. v. Manatt, Phelps & Phillips, LLP* (2017) 9 Cal.App.5th 885, 899-900 (*ECC Capital*); see also *Moshonov v. Walsh* (2000) 22 Cal.4th 771, 775.) As relevant here, statutory grounds for vacating an arbitration award exist where "[t]he arbitrators exceeded their powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted," or where the arbitrators refused "to hear evidence material to the controversy" or engaged in "other conduct . . . contrary to the provisions of this title." (Code Civ. Proc., § 1286.2, subds. (a)(4), (a)(5).)

On appeal from an order confirming an arbitration award, we review the trial court's order de novo. (*ECC Capital, supra*, 9 Cal.App.5th at p. 900.) "Where, as here, neither side asked for, and the trial court did not issue, a statement of decision, 'the appellate court will infer the trial court made implied factual

14

findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues.  [Citations.]  The appellate court then reviews the implied factual findings under the substantial evidence standard.'" (*Id.* at pp. 900-901.)

We review the specific question of whether the arbitrators exceeded their authority de novo.  (*ECC Capital*, *supra*, 9 Cal.App.5th at p. 900.)  "Arbitrators may exceed their powers when they act in a manner not authorized by the contract or by law, act without subject matter jurisdiction, decide an issue that was not submitted to arbitration, arbitrarily remake the contract, uphold an illegal contract, issue an award that violates a well-defined public policy, issue an award that violates a statutory right, fashion a remedy that is not rationally related to the contract, or select a remedy not authorized by law."  (*Cohen v. TNP 2008 Participating Notes Program, LLC* (2019) 31 Cal.App.5th 840, 868.)  They generally do not exceed their authority by reaching an erroneous conclusion of fact or law.  (*Id.* at p. 869.)

## II.    Analysis

Appellants contend the arbitrators exceeded their authority in four primary ways.  First, they argue the arbitrators had no authority to determine the arbitrability of or adjudicate claims against non-signatories to the arbitration agreement.  Second, appellants contend the arbitrators "did not have the right to hear claims where the Appellants were seeking or could seek punitive or consequential damages."  Third, appellants contend the arbitrators exceeded their authority by denying appellants the right to conduct "reasonable discovery" as required by the arbitration provision, and thus violated appellants' right to a fair

15

hearing.  Finally, they argue the arbitrators exceeded their authority by resolving the matter on dispositive motions and making factual findings unsupported by evidence.  We consider these arguments in turn.

### A.  Arbitration of Claims Against Nonsignatories

Appellants argue that both federal and state arbitration law require the trial court, not the arbitrator, to decide whether a nonsignatory to an arbitration agreement may be ordered to arbitration.  We agree.  "[N]otwithstanding an arbitrator's broad authority to resolve questions presented by a controversy, an arbitrator has no power to determine the rights and obligations of one who is not a party to the arbitration agreement." (*American Builder's Association v. Au-Yang* (1990) 226 Cal.App.3d 170, 179.) Thus, "[t]he question of whether a nonsignatory is a party to an arbitration agreement is one for the trial court in the first instance." (*Ibid.*; see also *Benaroya v. Willis* (2018) 23 Cal.App.5th 462, 469-470.)

However, we also agree with Holdings that below, appellants "agreed that all arbitrability issues – including 'who are proper parties to the Arbitration' – should be heard by the Panel, and that is what happened here."  Under the doctrine of invited error, this is fatal to appellants' claim of error. "The doctrine of invited error provides that a party may not assert as a ground for reversal an error that he or she induced the trial court to commit." (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 530; see also *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 ["Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error."].)  The logic behind this rule is that a party may not

16

mislead the trial court and then "profit[ ] therefrom in the appellate court." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)

During the hearing on the petition to compel arbitration, at which the parties litigated the questions of arbitrability and equitable estoppel,[5] plaintiffs specifically argued, "if we're going with the International Rules, it's the arbitrator's decisions [*sic*] whether to allow third parties. . . . The defendants made the argument that they should be able to join. The court said JAMS arbitration rules says the arbitrator makes that decision. The court can't make it." Plaintiffs later reiterated, "under the rules, if we're going to go by the JAMS rules govern, the JAMS arbitrator makes that decision, not this court," and explicitly contended, "the arbitrator is the only one that has the right to do it."

Appellants' attempts to make the opposite argument now are not well-taken. This is particularly so in light of appellants' immediate filing of an SOC naming Holdings and other nonsignatories as respondents in additional causes of action beyond those asserted in their trial court complaint, before the arbitrators even resolved the issue of whether those parties could

---

[5] The doctrine of equitable estoppel allows a nonsignatory to enforce an arbitration provision where "the claims the plaintiffs asserts [are] dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause." (*Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 217-218.) There are other bases on which a nonsignatory may enforce an arbitration agreement, but equitable estoppel is the only one the nonsignatories argued in this case.

17

properly be joined, and failure to challenge the arbitrators' authority to decide the equitable estoppel issue.

Our conclusion that the invited error doctrine forecloses the arbitrability argument also forecloses appellants' subsidiary arguments that "Holdings should have never been permitted to join the arbitration on equitable estoppel principles," and the arbitrators exceeded their authority by "allowing Holdings to benefit from the contractual rights afforded to the parties to the contract." We therefore do not address appellants' contentions that the arbitrators erred by concluding equitable estoppel applied, either by misapplying the law or making an erroneous finding of fact. (See *Moshonov v. Walsh*, *supra*, 22 Cal.4th at p. 775-776.)

### B. Arbitration of Claims Seeking Punitive or Consequential Damages

Appellants next argue the arbitrators exceeded their authority by adjudicating claims for which punitive or consequential damages were an available remedy, including their fraud and securities law causes of action. We disagree.

The arbitration provision states, in relevant part, that the "remedial authority of the arbitrator shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute; provided, however, that the arbitrator shall have no power or authority under this Agreement or otherwise to award or provide for the award of punitive or consequential damages against any party." Appellants assert that "the parties did not want the arbitrators to hear or decide any issues that involve consequential damages," and that this language limited the arbitrators' authority to hear claims "where the Appellants were seeking or could seek punitive

18

or consequential damages." The arbitrators deferred ruling on the meaning of this language until after dispositive motions were resolved. Due to the outcome of those motions, the issue was never addressed. Appellants contend that "decision to wait and see was in complete contradiction to the party's [*sic*] agreement and was not rationally related to the agreement."

Holdings contends, and we agree, that the plain language of the arbitration provision restricts the arbitrators' authority to award particular remedies but "provides no support for the notion that the parties intended to limit the *claims* that the Arbitrators are permitted to hear." Indeed, the expansive arbitration provision applies to "[a]ny controversy, dispute, or claim between the parties to this Agreement arising out of, in connection with, or in relation to the formation, negotiation, interpretation, performance or breach of this Agreement" regardless of the remedies associated with such claims. As the trial court observed in its tentative ruling on the petition to compel arbitration, "the arbitration simply caps [defendants'] liability at the total amount of the loss and states that an arbitrator cannot impose punitive damages on top of that amount." Appellants agreed to this limitation by signing the operating agreement, and we see no error in the arbitrators' decision to defer an express ruling until necessary.

Appellants alternatively point to another provision in the operating agreement that states, "remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Person may be lawfully entitled." They contend that provision, plus a provision from the separate subscription agreement stating that "the undersigned does not . . . waive any right granted to the undersigned under U.S. federal

19

or state securities law," together allowed appellants to seek punitive remedies "outside of the arbitration." Appellants assert it was not "rationale [*sic*] or reasonable" for the arbitrators to "force the Appellants to litigate this costly matter before arbitrators that could not award Appellant [*sic*] damages, but for which it was still contractually permitted to seek those damages outside of the arbitration." This argument is not persuasive on the question of what remedies the arbitrators were authorized to award. Moreover, whether appellants were contractually permitted to pursue certain remedies is not relevant in light of the fact that they have not demonstrated an entitlement to any remedies at all.

### C. Discovery Limitations

As outlined above, the arbitrators limited the scope of plaintiffs' discovery requests on the tolling issue. Appellants contend this "'targeted discovery' did not allow Appellants to obtain the testimony that the arbitrators themselves acknowledged was needed to address the true nature of the fraud in the case."[6] They assert that because the defendants used the

---

[6] The alleged "acknowledgement" was made in the arbitrators' award on one of the initial dispositive motions, which is also quoted above: "The Panel is not satisfied that this issue can be resolved on the merits based on the RSOC, the parties [*sic*] briefing, and the face of the relevant project documents. In the Panel's view, it seems likely that these issues can only be resolved with testimony from participants in the transactions who can provide insight into the structure and operation of the transaction, and the reasons for the loan's ultimate failure. Thus, the Panel concludes that it would be prudent to allow Claimants an opportunity to amend to more particularly spell out this claim, including facts that would preclude the application of the statute of limitations."

project documents in support of the final dispositive motion on the statute of limitations, the arbitrators should have allowed appellants "to dispose [*sic*] someone with knowledge of their content."  They further contend that the discovery limitations prevented them from obtaining "the hard data and records that were used to compile the financial tables that were presented to the Appellants," which in turn prevented them from establishing how the defendants "committed the fraud through their own financial documents."  Appellants also claim that the discovery limitations deprived them of a fair hearing by limiting their ability "to develop the circumstantial evidence necessary to prove their fraud claim or successfully oppose the final dispositive motion."

The arbitration provision states that "the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator."  It also requires the arbitrators to "apply the Federal Rules of Civil Procedure and the Federal Rules of Evidence" "[t]o the extent applicable and not inconsistent with" the arbitration provision.  Appellants essentially contend the arbitrators violated the Federal Rules of Civil Procedure and abused their discretion by depriving appellants of reasonable discovery.  We disagree.

Appellants selectively quote Federal Rule of Civil Procedure Rule 26(b)(1) for the proposition that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  (Fed. Rules Civ. Proc., rule 26(b)(1), 28 U.S.C.) However, they ignore the first clause of that rule, which states that it describes the scope of discovery "[u]nless otherwise limited by court order."  (*Ibid.*)  The rule expressly contemplates that a court may limit discovery.  That is precisely what the

21

arbitrators did here; they were authorized to do so both by the rule and the arbitration provision. "[A]rbitration is meant to be a streamlined procedure. Limitations on discovery. . . is one of the ways streamlining is achieved." (*Dotson v. Amgen, Inc.* (2010) 181 Cal.App.4th 975, 983.) The arbitrators' discovery order did not exceed their authority. The written order addressed each of plaintiffs' document requests individually and "in the context of the Claimant's [*sic*] fraud theory." The arbitrators' previous statement that "it seems likely that these issues can only be resolved with testimony from participants in the transactions" did not commit them to authorizing depositions or witness testimony to resolve claims that had since been amended. Moreover, arbitration procedures violate the common law right to a fair hearing ""only in the clearest of cases, i.e., when the applicable procedures essentially preclude the possibility of a fair hearing." [Citation.]'" (*Hoso Foods, Inc. v. Columbus Club, Inc.* (2010) 190 Cal.App.4th 881, 888-889.) Appellants have not demonstrated that the discovery limitations crossed that high threshold.

### D.     Reliance on Dispositive Motions

Appellants finally contend that the arbitrators overstepped their authority by resolving the matter on dispositive motions, which did not meet the standard of proof required by the arbitration provision. They again point to the arbitrators' order stating that it "seems likely" that an evidentiary hearing would be required, asserting that this statement "essentially foreclosed . . . that the matter could not be resolved without an evidentiary hearing." They also argue the arbitrators erroneously concluded that certain factual matters were undisputed.

22

The arbitration provision states, "The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it [*sic*] would be entitled to summary judgment if the matter had been pursued in court litigation."  The applicable JAMS rule similarly provides, "The Arbitrator may permit any Party to file a Motion for Summary Disposition of a particular claim or issue, either by agreement of all interested Parties or at the request of one Party, provided the other interested Parties have reasonable notice to respond to the request."  The arbitrators had authority under these provisions to resolve the matter on dispositive motions.

As previously discussed, the arbitrators' statement about the possible need for a hearing was made in the context of resolving a dispositive motion, and granting plaintiffs leave to amend their fraud claim.  It did not preclude the subsequent use of dispositive motions.  Appellants assert that "[a]t this point, the arbitrators should have transferred into allow [*sic*] full reasonable discovery and scheduling a trial on the merits."  However, after the arbitrators' statement, plaintiffs filed the SRSOC, thus amending their claims.  The arbitrators provided plaintiffs with an opportunity to conduct discovery, file briefing, and make arguments at a hearing before resolving the final dispositive motion.  They were not required to do more.

As appellants observe, the Federal Rules of Civil Procedure, which apply here per the arbitration provision, authorize summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  (Fed. Rules Civ. Proc., rule 56(a), 28 U.S.C.)  Appellants contend various

23

material facts remained in dispute, citing testimony from their expert. However, as noted above, the arbitrators rejected plaintiffs' declarations and that of their expert, rendering undisputed the contrary evidence proffered by defendants. Appellants' dissatisfaction with the arbitrators' evidentiary rulings and resultant conclusions that certain facts were undisputed is not relevant to whether the arbitrators exceeded their authority.

Appellants have not demonstrated that the arbitrators exceeded their authority. We thus find no basis to conclude that the trial court erred in confirming the final arbitration award.

## DISPOSITION

The judgment is affirmed. Respondent Holdings may recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


CURREY, P.J.


MORI, J.

24